UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

CHAMBERS OF
J. FREDERICK MOTZ
UNITED STATES DISTRICT JUDGE

101 WEST LOMBARD STREET
BALTIMORE, MARYLAND 21201
(410) 962-0782
(410) 962-2698 FAX

November 18, 2008

MEMO TO COUNSEL RE:  Dorothy V. Reed v. Airtran Airways
Civil No. JFM-07-2170

Dear Counsel:

This is an action for a reverse discrimination in which plaintiff asserts claims against her former employer for hostile work environment and retaliation. Both parties have moved for summary judgment. Plaintiff's motion will be denied, and defendant's motion will be granted.

My schedule does not permit me to write an extensive opinion. Instead, I will briefly summarize the reasons for my ruling in this letter. Please be assured, however, that I have carefully considered all of the arguments you have made.

A.

Analysis of the evidence upon which plaintiff relies demonstrates that although the environment in which plaintiff worked was extremely unprofessional and unpleasant, there is no basis for reasonably inferring that plaintiff was discriminated against because of her race.

1. Alleged Non-Promotion

In her opposition memorandum plaintiff argues that she was not promoted to lead supervisor despite having applied for the position. However, in her deposition she testified that she never applied for any promotion.

2. The "Stapler Incident" and the "Badge Incident"

Employees obviously should not throw things at one another. However, the fact that Doretha Crofton, who plaintiff says "threw a stapler at her," is African-American does not give rise to an inference that Crofton acted out of racial animus, particularly because Riecie Warren, who was standing next to plaintiff at the time, is herself African-American. Moreover, plaintiff's reaction - to yell at Doretha "not to ever throw a fricking stapler at . . . her again" reflects the volatility of plaintiff's own temper.

Similarly, the fact that on another occasion Ms. Warren threw plaintiff's badge on her computer and walked away reflects nothing about racial animus. Defendant's policies and

1

procedures required plaintiff to wear her badge when she was waiting upon a customer, as she was doing when Ms. Warren allegedly threw her badge on the computer.  Moreover, when plaintiff called Mike Shiver, defendant's station manager (who is Caucasian) to complain that she was being mistreated, Mr. Shiver apparently took the complaint seriously.  He called Ms. Warren and two other employees into his office and chastised them for their conduct.  Plaintiff, however, continued not to wear her badge and later in the day her African-American supervisor, Jackie Johnson told her to put the badge on.  Although plaintiff alleges that Ms. Johnson spoke to her in a "threatening and mean way," it should not be inferred that an employee is being racially discriminated against when a supervisor directs her to comply with company policy.

      3. The 2006 Annual Review and its Aftermath

Plaintiff received an annual performance review during an interview she received from three African-American women on August 22, 2006.  She alleges that she was screamed at during the interview.  Plaintiff complained about this interview to defendant, and defendant thereafter advised plaintiff that it would (1) "take[] the appropriate steps to ensure that this type of situation does not occur again," (2) disciplined the lead supervisor who was responsible for the way in which plaintiff was treated, and (3) agreed to provide plaintiff with a new performance review.

The events surrounding the interview constitute the strongest of evidence favoring plaintiff.  However, as set forth in Section B of this memorandum, the very fact that defendant agreed to take remedial measures when presented with an appropriate complaint from plaintiff undermines plaintiff's discrimination claims.  Moreover, the manner in which plaintiff responded to the evaluation clearly demonstrates that she contributed to her dysfunctional work environment.  Immediately after the interview, she called the operations office, believing Mr. Shiver was there.  He was away but the phone was answered by Lynn Thompson, a white financial supervisor.  Plaintiff loudly complained about the interview, herself and using bad language, such as "This don't make no G-d sense," and "I don't agree with this m-f evaluation."[1]

      4. The "Bus Stop" Incident

According to plaintiff, in the wake of plaintiff's response to her performance evaluation, two of her African-American supervisors decided to suspend her for insubordination.  Further,

---

[1]Plaintiff alleges that Ms. Thompson put her on a speaker phone when plaintiff called.  Assuming Ms. Thompson did so, the fact that a white supervisor (against whom plaintiff alleges no racial animus) acted inappropriately would give rise to no inference of discrimination.  Moreover, the record clearly shows that Ms. Thompson did not put plaintiff on a speaker phone but turned the speaker phone off when she realized the reason for the call and the highly agitated state plaintiff was in.  Likewise unavailing is plaintiff's allegation that Ms. Johnson said to her soon after the evaluation that "I hope no one in your family ever dies."  Self-evidently, that statement was not a threat because Ms. Johnson was not saying that she hoped someone in plaintiff's family died but that she hoped that no one in plaintiff's family ever dies.  Obviously, as explained by Ms. Johnson, Ms. Johnson (who had recently lost a sister) was trying to calm plaintiff down by putting things in proper perspective.

according to plaintiff, Ms. Johnson went to the employees' bus stop and yelled at plaintiff to return. Ms. Johnson's yelling was overhead by Bob Walton, the husband of Leslye Walton (who was formerly employed by defendant), who was sitting in his car waiting to pick his wife up. Perhaps Ms. Johnson should have been more sensitive to plaintiff's feelings and not gone to the bus stop to call plaintiff back. However, again the incident gives rise to no inference of racial discrimination. Moreover, the fact that it was necessary for Ms. Johnson to "yell" is confirmed by the fact that plaintiff herself has testified that she did not at first hear Ms. Johnson requesting her to return.

     5. Alleged Threats to Plaintiff

Plaintiff alleges (and complained to defendant) that employees of defendant threatened her at home and forced her to move out of her apartment. Assuming that plaintiff was forced to move out of her apartment as the result of threats (a fact defendant seriously challenges), plaintiff has identified no specific employee of defendant who made the threats to her. Further, there is no objective evidence supporting her claim that defendant was responsible for any threats.

     6. Not Permitting Plaintiff to "Bid" on Her Shift While She Was on FMLA Leave

Plaintiff contends that defendant did not permit her to bid on the shift she would be taking (as her seniority entitled her to do) while she was on FMLA leave. Plaintiff points to no African-American who was permitted to bid on his or her shift while on FMLA leave and, absent such a comparator, there is no basis for inferring racial discrimination from defendant's action. Moreover, defendant contends that it does not permit any of its employees to bid on their shifts while they are on FMLA leave, and this contention is supported by the record. The only person who plaintiff alleges was permitted to bid while she was out on FMLA leave is Ms. Walton, and the record shows that Ms. Walton was permitted to bid because on the days that the bids were submitted, she temporarily went off FMLA leave to come to the office to bid in person. As defendant points out, the most this evidence shows is that Ms. Walton knew how to "game the system."

     7. Ms. Walton's Affidavit

Plaintiff has submitted an affidavit from Ms. Walton. This affidavit is insufficient to support plaintiff's claims for at least three reasons. First, the record is clear that while Ms. Walton was employed by defendant and when she left defendant's employ, she made no allegations that she (or plaintiff) had been discriminated against on account of their race. Second, the conduct to which Ms. Walton asserts she and plaintiff was subjected are not the stuff of a hostile work environment claim. All that she says is that African-American supervisors talked to her in hostile terms as if they were talking to children, that their body language was hostile and unforgiving, that they would not provide any help (presumably to Ms. Walton or plaintiff), and that they "talked in a demeaning way without the slightest attempt to be civil."[2]

---

[2]Ms. Walton also alleges that the African-American supervisors allowed African-American workers to take long breaks and extended lunch hours that were not afforded to Ms.

Third, in her affidavit Ms. Walton characterizes plaintiff as "high-strung," confirming Ms. Walton's deposition testimony that plaintiff "is a nice woman but she does have a temper" and that although plaintiff "can be very sweet, sometimes her disposition isn't very pleasant."

      8. Plaintiff's Time Records and the "Black Bitches" Comment

In support of its summary judgment motion, defendant submitted attendance records showing that plaintiff had a problem with lateness. Defendant also asserted that Ms. Johnson claims that plaintiff once called her and another African-American supervisor "black bitches." Plaintiff contends that the attendance records clearly were doctored because if plaintiff had had lateness problems, she would have been discharged. Likewise, she says that Ms. Johnson obviously is lying about everything to which she has testified because if plaintiff had made the alleged "black bitches" comment her employment would have been terminated. These contentions are pure speculation. Moreover, in granting summary judgment for defendant, I am not relying at all upon plaintiff's attendance records or upon the credibility of Ms. Johnson. As the law properly requires, in ruling upon defendant's summary judgment motion, I am viewing the facts most favorably to plaintiff.

                                                B.

In addition to the matters thus far discussed, the record is devoid of any evidence that plaintiff every sought appropriate relief from defendant from the hostile work environment and retaliation to which she allegedly was subjected. She relies upon a lengthy letter she wrote on October 16, 2006 to Joseph Leonard, who plaintiff described as "the main guy . . ., one of the CEOs of" defendant. That letter came long after many of the incidents upon which plaintiff's claims are based. Moreover, it was not a responsible attempt to change the environment in which plaintiff worked. Rather, it was a threat that if plaintiff did not receive the cash and benefits totaling over six figures she was requesting, she would "go public with all of this."

As I have previously indicated, the work environment in which plaintiff was employed appears to have been dysfunctional. However, on the two occasions that plaintiff did seek remedial action from those in or close to the scene - after the "badge incident" and after she received an inappropriate annual evaluation - officials of defendant took action to correct the wrongs about which plaintiff complained. Perhaps plaintiff (and Ms. Walton) were mistreated by their African-American supervisors. However, plaintiff has proven neither that she was subjected to a hostile work environment or to retaliation. To a considerable extent she has only herself to blame, having occasionally let her temper get the best of her and having failed to take responsible steps to improve the bad working environment to which she herself contributed.

Despite the informal nature of this letter, it should be flagged as an opinion and docketed as an order.

                                            Very truly yours,

---

Walton or plaintiff. This is a more serious allegation, but plaintiff provides no documentation to support it.

/s/


J. Frederick Motz
United States District Judge